# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 30, 2026

Lyle W. Cayce
Clerk

No. 23-30825

---

KENTRELL PARKER, *on behalf of themselves and all others similarly situated*; FARRELL SAMPIER, *on behalf of themselves and all others similarly situated*; REGINALD GEORGE; JOHN TONUBBEE, *on behalf of themselves and all others similarly situated*; OTTO BARRERA, *on behalf of themselves and all others similarly situated*; CLYDE CARTER, *on behalf of themselves and all others similarly situated*; EDWARD GIOVANNI, *on behalf of themselves and all others similarly situated*; RICKY D. DAVIS, *on behalf of themselves and all others similarly situated*; LIONEL TOLBERT, *on behalf of themselves and all others similarly situated*; RUFUS WHITE, *on behalf of themselves and all others similarly situated*; SHANNON HURD; ALTON ADAMS; IAN CAZENAVE; EDWARD WASHINGTON; ALTON BATISTE,

*Plaintiffs—Appellees*,

*versus*

TIM HOOPER, *Warden, Louisiana State Penitentiary, in his official capacity*; ASHLI OLIVEAUX, *Assistant Warden for Health Services, in her official capacity*; GARY WESTCOTT, *Secretary, Louisiana Department of Public Safety and Corrections*; RANDY LAVESPERE, *Medical Doctor*; STACYE FALGOUT; PAUL TOCE; BILL HAWKINS; CYNTHIA PARK, ACNP; THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:15-CV-318

_____

Before ELROD, *Chief Judge*, and JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.[1]

EDITH HOLLAN JONES, *Circuit Judge*:

This appeal arises from atavistic court rulings that seek to control prison management in violation of constitutional law and fundamental principles of federalism. Congress enacted the Prison Litigation Reform Act ("PLRA") in 1996 to rein in such judicial adventurism, 18 U.S.C. § 3626(a), (f), yet its precepts were violated by the district court. We have appellate jurisdiction to review the state defendants' appeal, and we VACATE and REMAND to the district court.

## BACKGROUND

In 2015, a class of inmates filed suit against the defendants-appellants ("Defendants") who run the Louisiana State Penitentiary ("LSP") at Angola. They claimed that the prison's medical care was constitutionally deficient, and it failed to follow the Americans with Disabilities Act and the Rehabilitation Act (collectively, "ADA/RA"). Although the case was tried in October 2018, evidence of prisoners' medical treatment that occurred years earlier was introduced. In March 2021, the court entered a 124-page Liability Opinion with extensive findings concerning alleged systemic Eighth Amendment violations and ADA/RA noncompliance.

_____

[1] Judge Southwick concurs only in the holding that the court has jurisdiction to consider this appeal.

No. 23-30825

Chastened,[2] the prison authorities immediately began renovating their facilities, upgrading personnel, and improving standards of care, as they anticipated the bifurcated remedial trial scheduled for June 2022. At that trial, the court considered some (but not all) of the interim improvements and the scope and nature of any remedies that it would require of LSP. After trial, LSP made other improvements, including the introduction in October of an electronic medical recordkeeping system, which promised to rectify numerous concerns of the court. *See, e.g.*, *Lewis v. Cain ("Remedial Opinion")*, 701 F. Supp. 3d 361, 389 (M.D. La. 2023) ("The utter and complete disarray of the medical records is emblematic of indifference."). Citing its trial-management discretion, the court refused to consider the upgrades. Not until November 2023 was the court's 104-page Remedial Opinion issued, together with a Remedial Order and Final Judgment. The Judgment stated:

> Judgment is hereby entered in favor of Class Plaintiffs and the ADA Sub-Class Plaintiffs and against Defendants, the current Warden of the Louisiana State Penitentiary, et al. This matter shall be closed by the Clerk of Court; however, the Court retains jurisdiction over the procedures set forth in the Court's Remedial Order and any issues pertaining thereto.

Further, the Remedial Order stated, in pertinent part:

> For the reasons set forth in the Court's Rulings, dated March 31, 2021, ("Liability Ruling") and November 6, 2023, ('Remedial Ruling'):
>
> **IT IS HEREBY ORDERED**: . . . .

---

[2] Defendants also challenge the district court's liability findings but made improvements notwithstanding their disagreement.

No. 23-30825

Six decretal sections of the Remedial Order followed, concerning Special Masters; Remedial Plans for Medical Care and the ADA; Cooperation and Access to require the Defendants' coordination with Special Masters or their representatives; Reporting, a timetable for reporting to the court; Monitoring Implementation of Remedial Plans and Periodic Reports to the Court; and Fees and Costs.

Several features of the Remedial Order must be highlighted. In its first section, the court "[o]rder[ed]" the appointment of special masters "to *cure and eliminate* the violations found in the Court's Liability Ruling and Remedial Ruling." The parties were required to convene and agree on three "special masters" in lieu of only one authorized by the PLRA. *See* 18 U.S.C. § 3626(f). The Remedial Order ignored the PLRA's express appointment procedure for "a" special master. *Id.* The Remedial Order required the state to bear the cost of special masters, contrary to the PLRA. *Id.* § 3626(f)(4). Most egregiously, the Remedial Order omitted any indication that its prescriptions adhere to the needs-narrowness-intrusiveness limitations imposed on federal courts' injunctive relief by the PLRA. *Id.* § 3626(a)(1)(A). In their panel brief, the Plaintiffs *conceded* these violations of the PLRA.

Second, the Remedial Order's section titled, "Medical Care Remedial Plan" identified seven areas of "[s]tandards and [p]rocedures" that must be upgraded: sick call, clinical care, specialty care, infirmary and in-patient care, emergency care, medical-records management, and medical management and administration. The Remedial Order expressly incorporated the court's Remedial Opinion, which identified with even greater specificity the allegedly deficient areas of care at LSP.

Third, under the "Fees and Costs" provision, the court authorized Plaintiffs' counsel to seek fees as "prevailing parties," and counsel did so, seeking over $8 million in fees.

4

Upon entry of the Judgment, the court administratively closed the case. This appeal followed.

At Defendants' request, a panel of this court stayed the Remedial Order pending appeal, and another panel later reviewed the merits. *Parker v. Hooper ("Stay Opinion")*, 95 F.4th 231 (5th Cir. 2024) (per curiam); *Parker v. Hooper ("Panel Opinion")*, 128 F.4th 691 (5th Cir. 2025) (per curiam). At no time during the stay proceeding or in the parties' briefs did the parties question this court's appellate jurisdiction. This court raised the question sua sponte and received further briefing. A panel majority then issued its decision that would have dismissed the appeal. *Panel Opinion*, 128 F.4th at 693. The court voted to rehear the case en banc, consequently vacating the panel opinion. *Parker v. Hooper*, 134 F.4th 867 (5th Cir. 2025) (per curiam).

## DISCUSSION

The following discussion explains why we have appellate jurisdiction under either 28 U.S.C. § 1291 or § 1292(a)(1); why the district court's Remedial Order violates the PLRA in several respects; and why the district court's Remedial Opinion and Remedial Order erroneously found the Defendants guilty of ongoing deliberate indifference to serious medical needs, the constitutional prerequisite both for liability and institutional-injunctive relief.

### I.

Our appellate jurisdiction is ordinarily governed by 28 U.S.C. § 1291 and § 1292. Section 1291 authorizes "appeals from all *final* decisions of the district courts," *id.* § 1291 (emphasis added), while Section 1292, pertinent here, permits appeals from "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions," *id.* § 1292(a)(1). We take the district court's entry of "Final Judgment" literally and construe it as a "final," appealable judgment. But

even if that interpretation were proved faulty, the Remedial Order grants interlocutory injunctive relief, which is appealable to this court.

A.

The Remedial Order and Final Judgment are "final" under Section 1291 because, together, they ended the litigation between the class and the Defendants favorably to the Plaintiffs and specified a detailed framework implementing injunctive relief. By every objective measure, the district court's Final Judgment resolved the substantive issues of liability and remedy, subject only to ongoing compliance procedures.

As the Remedial Opinion stated, the court would "enter *judgment* in favor of Plaintiffs and against Defendants." *Remedial Opinion*, 701 F. Supp. 3d at 441 (emphasis added). In line with that intention, the Final Judgment retained jurisdiction in the district court only over "*procedures* set forth in the Remedial Order and any issues pertaining thereto." The Remedial Order prescribed appointment of special masters to "cure and eliminate" the violations found in the court's previous rulings.[3] It further described the Plaintiffs as "prevailing parties" entitled to file a fee request. Although, typical of institutional-reform orders, the court provided for (more than one) special master to oversee its decrees, the district court carefully articulated at length which unconstitutional medical-care conditions must be cured. Expanding on the seven broad areas of care it detailed, the Remedial Order incorporated the court's Remedial Opinion, which, in dozens of pages,

---

[3] ROA.30661 ("The Court hereby Orders the appointment of 3 Special Masters to develop proposed remedial plans, make recommendations regarding implementation and monitor implementation of remedial plans ('Remedial Plans') to cure and eliminate the violations found in the Court's Liability Ruling and Remedial Ruling.").

itemized shortcomings in every one of those seven areas of care and disability-law compliance.[4]

Labels alone cannot make a non-final order "final" for appellate purposes. *Riley v. Kennedy*, 553 U.S. 406, 419, 128 S. Ct. 1970, 1981 (2008). But common sense compels us to acknowledge that the district court's Final Judgment was in fact final. To emphasize the practical point, what conscientious attorney for the Defendants would *not* have filed a notice of appeal from the three concurrently issued documents: the Remedial Opinion, Remedial Order, and Final Judgment?

The panel majority relied on the general rule that "[a] final decision is one by which a district court disassociates itself from a case." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408, 135 S. Ct. 897, 902 (2015) (internal quotation marks and citation omitted). But Section 1291 has not been applied with wooden formality. The Supreme Court held long ago that "[a] pragmatic approach to the question of finality has been considered essential to the achievement of the just, speedy, and inexpensive determination of every action: the touchstones of federal procedure." *Brown Shoe Co. v. United States*, 370 U.S. 294, 306, 82 S. Ct. 1502, 1513 (1962) (internal quotations and citation omitted). In *Brown Shoe*, an antitrust case, the Court held that requiring the defendant to propose a post-judgment remedial plan was "sufficiently independent of, and subordinate to, the issues presented by

---

[4] For example, as to infirmary and in-patient care, "patients continue to be outside of sight or sound of nurses due to the positioning of nurses and black coverings over windows"; nurses do not round patients every two hours; "head-to-toe" physical assessments of patients by nursing staff are not performed sufficiently; infirmary forms do not provide a space for date and time; vital-sign flowsheets do not allow for documentation of the time vitals were taken; the infirmary does not provide adequate equipment and supplies including "crutches, walkers, or bedside commodes'" and inmate orderlies perform tasks outside the scope of their appropriate use. *Remedial Opinion*, 701 F. Supp. 3d at 410–11.

th[e] appeal to make the case in its present posture a proper one for review now." *Id.* at 308, 82 S. Ct. at 1514. *Brown Shoe* set the standard for this court's routine handling of institutional-reform decrees: When the merits of the case have been decided, this court has appellate jurisdiction. Ongoing injunctive proceedings to remedy unconstitutional conditions are appealable as they become contested.[5]

From the 1960s onward, this court has had significant experience in reviewing institutional-reform decrees, particularly as schools were judicially desegregated. *See* Frank T. Read, *The Bloodless Revolution: The Role of the Fifth Circuit in the Integration of the Deep South*, 32 Mercer L. Rev. 1149, 1153–65 (1981). In such cases, an appeal of the initial judgment of liability often occurred and was later followed by a series of appeals as injunctive measures moved forward. *See id.* at 1155–56 & 1155 n.18 (discussing the vast procedural history of the *Bush v. Orleans Parish School Board* litigation, and citing every reported decision involved); *see also, e.g.*, *Singleton v. Jackson Mun. Separate Sch. Dist.*, 348 F.2d 729, 729 n.1 (5th Cir. 1965) (noting that its procedural history involved district-court injunctions that required the creation of desegregation plans and multiple appeals from various district-court orders).

---

[5] *See, e.g.*, *M. D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 243 (5th Cir. 2018) (affirming in part, reversing in part, vacating, and remanding for modification of injunction that required sweeping changes to Texas's foster-care system); *M. D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 275–76 (5th Cir. 2019) (affirming in part, modifying in part, and vacating in part district court's modified injunction); *M. D. ex rel. Stukenberg v. Abbott*, No. 24-40248, 2024 WL 1651273, at *1 (5th Cir. Apr. 17, 2024) (administratively staying contempt order and district-court proceedings); *M. D. ex rel. Stukenberg v. Abbott*, No. 24-40248, 2024 WL 2309123, at *1 (5th Cir. May 20, 2024) (granting stay of district court's contempt order); *see also Ball v. LeBlanc*, 792 F.3d 584, 598 (5th Cir. 2015) (addressing appeal after the district court's injunction only required Louisiana to "develop a plan" to keep prisons cooler).

No. 23-30825

A related but typical example of this court's assertion of appellate jurisdiction is found in *Morales v. Turman*, 535 F.2d 864, 867 (5th Cir. 1976), *rev'd on other grounds*, 430 U.S. 322, 97 S. Ct. 1189 (1977). The district court there determined that practices at Texas's juvenile correctional facilities constituted cruel and unusual punishment under the Eighth Amendment. *Id.* at 866–67. The plaintiffs maintained that no final, appealable order had issued because "the judge withheld issuance of permanent injunctive relief pending submission of a comprehensive plan to be drawn up by the parties." *Id.* at 867 n.6. But this court held, "[t]he difficulty with this contention is that[,] while some flexibility was left to the parties in determining precisely how compliance with the minimum standards would be structured, the District Court made it perfectly clear that any plan submitted must be consistent with the minimum requirements laid out in its opinion." *Id.* Consequently, "[i]n circumstances [like] these, the requirement of finality must be given a practical construction." *Id.* On further appeal, the Supreme Court simply stated that the district court's "judgment is reviewable on the merits in the Court of Appeals." *Morales v. Turman*, 430 U.S. 322, 324, 97 S. Ct. 1189, 1190 (1977) (citing 28 U.S.C. § 1291).

Although nearly fifty years old, *Morales* remains a controlling precedent in this circuit. The objection that the court's liability findings there were *more* detailed than those in this case is in error.[6] In *Morales*, the legally relevant elements of decretal terms like "adequate infirmary facilities" became clear in light of the court's liability opinion. Here, too, the

---

[6] *Compare* ROA.30661–65 (plan must address, among other things, "Sick Call" standards such as "the sick call request process, evaluation by a provider, and documentation"; "Emergency Care" standards including "protocols for the appropriate use and training of EMTs"; and "the appointment of a qualified, properly trained ADA Coordinator"), *with Morales v. Turman*, 383 F. Supp. 53, 105 (E.D. Tex. 1974) (plan must address "[a]dequate infirmary facilities" and "[a]ccess to medical staff without delay or interference").

legally relevant elements of the already-specific Remedial Order are clear in light of the Remedial Opinion's granular explication of LSP's constitutional shortcomings.[7]

Critically, none of the decisions cited by plaintiffs in support of non-finality was issued in the context of institutional-reform litigation. *Cf. Ueckert v. Guerra*, 38 F.4th 446, 448 (5th Cir. 2022) (dismissing an appeal of a qualified-immunity decision as untimely); *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 795–800, 109 S. Ct. 1494, 1496–99 (1989) (holding that a denial of a defendant's motion to dismiss an indictment is not immediately appealable).

Moreover, out-of-circuit caselaw may support a decision of non-finality, but this court is not bound by it. *See, e.g.*, *Parsons v. Ryan*, 949 F.3d 443, 473 (9th Cir. 2020); *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 464–65 (9th Cir. 1989). The Ninth Circuit views "orders requiring the submission of detailed plans" as "not final orders appealable" under Section 1291. *Parsons*, 949 F.3d at 473 (citation omitted); *Balla*, 869 F.2d at 464–65. The court in *Balla* expressly distinguished its approach from this circuit's caselaw. 869 F.2d at 464–65 (distinguishing *United States v. Alabama*, 828 F.2d 1532, 1536-38 (11th Cir. 1987)); *Alabama*, 828 F.2d at 1537 ("Our

---

[7] Take, for example, the Remedial Order's and Opinion's specific dictates with respect to sick-call standards. The Opinion held that LSP's sick call is constitutionally inadequate because LSP does not review complaints daily; the sick-call request form provides no place for the patient to time and date their request or time and date when the request was received; the triage process is not explained and is not noted in patient charts; physical examinations are performed by EMTs rather than by nurse practitioners; and sick calls are at times conducted via telemedicine rather than in-person. *Remedial Opinion*, 701 F. Supp. 3d at 392–95. These are not "mere guidelines subject to further negotiation," but clear constitutional deficiencies the remedial plan "must be consistent with" and remedy. *See Morales*, 535 F.2d at 867 n.6. The Remedial Opinion and Order establish the requirements LSP must satisfy to pass constitutional muster with sufficient specificity to permit appellate review.

decision follows the reasoning of this court's predecessor in *Morales v. Turman*.").

On the other hand, as noted, the Eleventh Circuit continues to follow *United States v. Alabama* and *Morales*. In *JW ex rel. Tammy Williams v. Birmingham Board of Education*, the district court's order was deemed final and appealable because it contained detailed factual findings and legal conclusions about constitutional violations. *See* 904 F.3d 1248, 1254–56 (11th Cir. 2018). That the court ordered the parties post-judgment to "submit a proposed training and procedure plan that would remedy the constitutional problems identified in its order" and included for guidance a series of "general practices" did not detract from the appealability. *Id.* at 1255.

The finality of the district court's Final Judgment should not have been debatable. The court supported its monumental opinions holding LSP liable for unconstitutional deprivation of prisoner medical care by itemizing hundreds of exact remedies required and by ordering special masters to "cure and eliminate" the violations. Indeed, the parties to the litigation never considered finality an issue before this court raised it. There is no support in the record for Plaintiffs' contention that the Final Judgment is not "final" because, at some future date, the district court may reduce its demands on LSP after the special masters report back on prescriptive measures. To the contrary, the court "made perfectly clear" exactly how any remedial plan must fulfill the "minimum requirements" of the Eighth Amendment and the ADA/RA in order to "cure and eliminate" the violations.[8] *See Morales*, 535

---

[8] Nothing in the district court's 200-plus pages of opinions demonstrates uncertainty as to what it considered LSP's constitutional violations or areas for which it required remedies. Nor does the record show any attempt by the court to follow the PLRA's needs-narrowness-intrusiveness requirements (beyond a perfunctory citation) or any interest in re-trying its merits and remedies opinions in the course of dealing with special masters.

No. 23-30825

F.2d at 867 n.6. This appeal conforms to Fifth Circuit precedent and a flexible and "practical" interpretation of finality condoned by the Supreme Court. *See Brown Shoe*, 370 U.S. at 306, 82 S. Ct. at 1513; *Abbott v. Perez*, 585 U.S. 579, 601, 138 S. Ct. 2305, 2323 (2018).

B.

Alternatively, if construing the court's Final Judgment as "final" is erroneous, the district court's Remedial Order supports an appeal under Section 1292(a)(1) as an interlocutory order granting an injunction. When "an order has the practical effect of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Abbott*, 585 U.S. at 594, 138 S. Ct. at 2319 (quotation marks and citation omitted).[9] In the context of institutional-reform litigation, this court does not delay review until the minutiae of a remedial plan have been settled. Doing so would undermine the very purpose of Section 1292(a)(1). As the Court noted in *Abbott*, "[m]uch harm can occur before the final decision in the district court"—"[l]awful and important conduct may be barred, and unlawful and harmful conduct may be allowed to continue." *Id.* at 595, 138 S. Ct. at 2319. In this case, the district court's insistence on a Remedial Order that plainly violated the PLRA and exceeded the court's authority constitutes the "unlawful and harmful conduct" that would continue absent appellate review.

*Abbott* powerfully confirms that "whether any particular remedies would have ultimately been ordered by the District Court" does not deprive

---

[9] The dissents construe the Remedial Order as "relating only to the conduct or progress of the litigation" and therefore purely interlocutory, like a discovery order. That seems unlikely, given over ten years of litigation culminating in 200+ pages of substantive rulings by the district court. In any event, the dissents' principal authority, *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 275–79, 108 S. Ct. 1133, 1136–38 (1988), held only that a district court decision not to exercise *Colorado River* abstention at the beginning of a case was interlocutory and unappealable.

an appellate court of jurisdiction. *Id.* at 601, 138 S. Ct. at 2323. In that case, a three-judge court held that (1) Texas's legislative redistricting plans violated Section 2 of the Voting Rights Act and the Fourteenth Amendment, and (2) the violations "must be remedied." *Id.* at 598, 138 S. Ct. at 2321. And if Texas did not intend to adopt new plans, the court would likely do so. *Id.* But the district court's order did no more. The Supreme Court recognized that Texas risked "deleterious consequences" if it attempted to implement redistricting plans the district court had just found unconstitutional. *Id.* at 599, 138 S. Ct. at 2322. The three-judge court's rejection of the status quo was held sufficiently injunctive to establish appellate jurisdiction. *Id.* at 601, 138 S. Ct. at 2323. The Court explicitly rejected the contention that "appellate jurisdiction is lacking . . . because we do not know at this point what a remedy would entail, who it would affect, and when it would be implemented." *Id.* (internal quotation marks and citation omitted). As in *Abbott*, there is no hint in the record here "that the court contemplated the possibility of allowing" the status quo at LSP to continue. *See id.* at 599, 138 S. Ct. at 2322. The Remedial Order's clear outline of necessary changes to LSP medical care is sufficient to establish appellate jurisdiction under the "practical effect" given to Section 1292(a)(1) by *Abbott*. *See id.* at 595, 138 S. Ct. at 2320.

*Abbott*, though critical, was hardly the first word on the interpretation of Section 1292(a)(1). During the school-desegregation era, when "the [district] Court positively and affirmatively directed that a plan be submitted that would provide for carrying out the [order] that [was] later to be effectuated," we held that "*the ordering of the plan dealing expressly with these prohibited acts amounts to a mandatory injunction.*" *Bd. of Pub. Instruction of Duval Cnty. v. Braxton*, 326 F.2d 616, 619 (5th Cir. 1964) (emphasis added). Consequently, the court's order was appealable. *Id.* at 617. In *Morales*, this court alternatively held that, "[i]n any event, the order requiring that the

13

parties meet and negotiate a plan complying with the decision is itself a mandatory injunction which is appealable" under Section 1292(a)(1). 535 F.2d at 867 n.6; *see also Johnson v. Gambrinus Co./Spoetzel Brewery*, 116 F.3d 1052, 1056–57 (5th Cir. 1997) (Section 1292(a)(1) appellate jurisdiction existed when district court ordered parties to meet and negotiate a plan for future compliance with the ADA); *Brumfield v. La. State Bd. of Educ.*, 806 F.3d 289, 296 (5th Cir. 2015) (an order requiring state to submit reports of racial data and test scores to the federal government was "not for discovery" and constituted an appealable injunction under Section 1292(a)(1)).

The analogies between our precedents and the instant case are unavoidable. The fact that details of LSP's compliance may need to be worked out is no different from the future implementation of detailed school-desegregation plans that this court routinely reviewed on an interlocutory basis. *See Braxton*, 326 F.2d at 617. The court's orders requiring the LSP to "meet and confer" with the Plaintiffs to select special masters, to provide documents and LSP personnel at the masters' request, and to pay for special masters and redress innumerable violations are on point with appellate-review decisions in *Morales*, 535 F.2d at 867 n.6, and *Johnson*, 116 F.3d at 1056–57. As in *Brumfield*, these provisions are not interim orders that the court will alter, but essential parts of the district court's remedial framework. Echoing *Brumfield*, the *current* requirements of the Remedial Order alone will subject LSP to a "burdensome, costly, and endless process," and the Remedial Order contemplates a "new and different . . . regime." 806 F.3d at 297.

Plaintiffs offer several arguments against Section 1292(a)(1) jurisdiction: (1) the district court's rulings are essentially precatory and have yet to mature into injunctive decrees enforceable against LSP; (2) only a "forthcoming injunction" will "clarify" the issues on appeal; and (3) the

Remedial Order's provisions concerning special masters are procedural, not injunctive. None is persuasive.

Plaintiffs' first argument relies on out-of-circuit precedents for the general proposition that an order requiring submission of a remedial plan is generally not an appealable injunction subject to Section 1292(a)(1). *See Armstrong v. Wilson*, 124 F.3d 1019, 1024 (9th Cir. 1997). *Armstrong*'s narrower interpretation of appellate jurisdiction fails to control over this court's wealth of precedent. And oddly, from Plaintiffs' perspective, the *Armstrong* court *upheld* its jurisdiction to review a prison decree requiring preparation of a plan to comply with the ADA. Although the final content of the plan remained unknown, the district court's order made the content and scope of the remedial scheme sufficiently clear to enable appellate review. As *Armstrong* elaborated, "[t]he [district] court further directed that the plan address specific substantive concerns of the disabled inmates such as disability grievance procedures, reception center processing times, accommodations for emergency situations, assistive aids, accessibility of new construction, criteria for medical disabilities, and school and job assignments for disabled prisoners." *Id.* at 1022 (citation omitted). Here, the specificity with which the district court condemned LSP's inmate medical care, the remedies it ordered, and the Remedial Order provisions that ignore the PLRA are all "sufficiently clear to enable appellate review." *See id.*

The answer to Plaintiffs' second argument, urging that a final injunction (whenever that may be issued) will "clarify" the issues for appeal, is also answered by *Armstrong*. Although no final remedial plan had been settled, the court concluded, it "will in no way alter our 'appellate perspective' on the single issue the defendants raise in this appeal of the remedial order: whether the ADA and RA apply to state prison inmates." *Id.*

In this appeal, LSP posits that the district court applied the wrong legal standards in holding the Defendants liable, in ordering systemic institutional changes in prisoner medical and disability care, and in failing to apply the PLRA. These are discrete issues of law; their analysis will not change with possible tinkering in the "implementation" of the Remedial Order. For instance, the special masters might propose to "cure and eliminate" the court's finding that orderlies were inadequately trained by one of several methods (hiring better trained orderlies, upgrading training, or using more telemedicine facilities). But the variety of approaches does not change the substantive questions about prison officials' deliberate indifference as a matter of liability in the first instance or in making changes since the litigation commenced.

Adjudicating the district court's noncompliance with the PLRA is also, contrary to the Plaintiffs' contention, a discrete and ripe issue. They assert that, when "an actual injunction issues," the appellate issues will be "clarified" because the court's order may then be "narrowly drawn, extend[] no further than is necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). This is what the PLRA requires, and the district court had to comply with these strictures when it considered and issued its Remedial Opinion and Remedial Order. That the court may choose to cure the statutory deficiency of its rulings in the future (after LSP has been forced to expend even more time, energy, and resources litigating the details of hundreds of compliance modules) is hardly an argument for postponing immediate appellate review.

Finally, the Remedial Orders' provisions for special masters are not procedural, but plainly injunctive. Plaintiffs' supplemental en banc brief appears to concede that the Remedial Order actually requires the Defendants to do certain things: "meet and confer" to discuss potential masters and

"submit" the names to the court; make LSP headquarters employees, wardens, and security personnel available to facilitate records requests and prison access by special masters; and pay the masters' costs. Plaintiffs minimize the breadth of the orders, however, by analogizing them to mere discovery rulings designed "to advance litigation toward trial." *See Panel Opinion*, 128 F.4th at 696. Appointing special masters and facilitating broad prison and records access do not represent "discovery"; they are part of the LSP's punishment for allegedly violating constitutional duties. Even if the Remedial Order provisions are interlocutory, they are likely subject to contempt if disobeyed. Worse yet, Plaintiffs already conceded that the district court's prescribed use of special masters violates the PLRA in several ways. These provisions, even apart from the infirmities of the court's reasoning in assessing liability and remedies, threaten "deleterious consequences" for LSP were it to refuse compliance. *Abbott*, 585 U.S. at 599, 138 S. Ct. at 2322. *Abbott* is on point, as it gave "practical effect" to Section 1292(a)(1) in upholding the appealability of a court order that functionally equaled an interlocutory injunction. *Id.* at 595, 138 S. Ct. at 2320.

Along with our jurisdiction to review the court's injunctive orders, we may also review the Remedial and Liability Opinions as briefed by both parties. This court's appellate jurisdiction extends to "determining whether there is any insuperable objection, in point of jurisdiction *or merits*" to the injunction. *Denver v. N.Y. Tr. Co.*, 229 U.S. 123, 136, 33 S. Ct. 657, 663 (1913) (emphasis added); *see also* 16 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3921.1 (3d ed. 2024) (appellate review "properly extends to all matters inextricably bound up with the injunction decision"); *Abbott*, 585 U.S. at 603–07, 138 S. Ct. at 2324–26 (examining merits of district-court judgment supporting injunction); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96 (2d Cir. 2012).

No. 23-30825

The consequences of Plaintiffs' belated desire to withhold appellate review should not be overlooked. First, doing so might prejudice their class members, who from their perspective are being denied the medical care they deserve while the details of further relief take a year or two to effectuate. Second, if LSP continues to upgrade medical care, whether or not it satisfies their preconceptions of constitutional adequacy, Plaintiffs jeopardize their argument that the Defendants have been acting with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 845, 114 S. Ct. 1970, 1983 (1994); *Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2022) (stating that "[d]eliberate indifference is determined based on prison officials' *current* attitudes and conduct" (emphasis added; internal quotations omitted)). Third, rejecting appellate jurisdiction here is not a "no harm, no foul" issue that affords the Defendants an opportunity to fight another day. The state cannot realistically claw back any fees that are erroneously awarded to Plaintiffs' counsel, nor can it recover the prison's administrative time, resources, and costs expended in complying with Remedial Order provisions that violate the PLRA and substantive law. Fourth, the intrusion on vital interests of federalism mandated by the district court's rulings cannot be tolerated. As the Supreme Court recognized fifty years ago, "[i]t is difficult to imagine an activity in which a State has a stronger interest . . . than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S. Ct. 1827, 1837 (1973). But if this court were to deny appellate review now, the precedent would condone shielding from review district court orders that prescribe relief in broad terms and violate the PLRA, with finality just over the horizon. The intrusions on states' interests would be irretrievable.

The reality of institutional-reform litigation is that courts' sweeping decrees consistently involve long-term relief, and courts impose judgments and remedial orders with finality although they do not "dissociate" themselves from the case in managing post-judgment details. This court,

now fortified by *Abbott*, has not required and will not require public entities subjected to broad, compulsory remedial decrees to wait until the ink is dry on every minute point that may later arise in an institutional-reform plan before permitting appellate review. We have jurisdiction under either Section 1291 or 1292(a)(1).

## II.

Normally, appellate review considers the merits of a judgment before addressing remedial issues. We invert the order here because imperatives created by Congress in the PLRA were, as Plaintiffs themselves acknowledge, violated in several ways. Even if the district court's constitutional conclusions were to withstand scrutiny (as discussed below), the PLRA governed its remedial proceedings. A federal court's failure to observe strictures that Congress enacted precisely to cabin our jurisdiction over prison reform cases is intolerable.

Congress passed the PLRA in 1996 to limit the oversight of state prisons by federal courts. *See* Pub. L. No. 104-134, 110 Stat. 1321. The law was enacted "in the wake of a sharp rise in prisoner litigation in the federal courts," and it "contains a variety of provisions designed to bring this litigation under control." *Woodford v. Ngo*, 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *see also Valentine*, 993 F.3d at 292–93 (5th Cir. 2021) (Oldham, J., concurring) (observing that 24% of state prisons were subject to federal structural injunctions in 1984). To eliminate federal court interference with state and local prison management, the PLRA "establishe[d] standards for the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331, 120 S. Ct. 2246, 2250 (2000). The PLRA reinforced the Supreme Court's recognition fifty years ago that "[i]t is difficult to imagine an activity in which a State has a stronger interest . . . than the administration of its prisons." *Rodriguez*, 411 U.S. at 491–92, 93 S. Ct. at 1837. Still today, the Court acknowledges "sensitive

federalism concerns" when federal court decrees usurp a state's sovereignty and authority over its prisons. *Horne v. Flores*, 557 U.S. 443, 448, 129 S. Ct. 2579, 2593 (2009).

The Remedial Order violated the PLRA by (1) failing the needs-narrowness-intrusive requirements and (2) violating the special master provisions.

## A.

First, the Remedial Order constituted "prospective relief," defined by the PLRA as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). "Relief" is further defined as "*all relief in any form* that may be granted or approved by the court . . . ." *Id.* § 3626(g)(9). Every mandate of the Remedial Order, therefore, had to pass muster under the needs-narrowness-intrusiveness provision that is the PLRA's cornerstone. *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 626 (5th Cir. 2024). That provision states:

> Prospective relief . . . shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right . . . .

18 U.S.C. § 3626(a)(1)(A).

During the remedial phase of the case, the district court noted the needs-narrowness-intrusiveness standard in a ruling in limine. Following that perfunctory citation, there is no further mention of Section 3626(a)(1) in the court's subsequent 104-page Remedial Opinion or in the Remedial Order. The Remedial Order, instead, globally requires the "special masters" to propose remedial plans that will "cure and eliminate the violations found in

the Court's Liability Ruling and Remedial Ruling." Together, those rulings prescribe hundreds of detailed changes in every aspect of the prison's medical care. To be sure, the Remedial Order discussed the impact of numerous upgrades to personnel, training, facilities, and communication that the Defendants had made before the remedial trial. But it essentially dismissed all of them by finding (over and over) that the changes were insufficient to "cure the violations" found in the Liability Opinion. Further, the district court refused to admit evidence of or consider LSP's adoption of an electronic medical-records-management system a few months after the remedial trial—but more than a year before it issued its Remedial Opinion and Order. The overall result of the district court's orders, or failure to consider ongoing changes, is a mishmash of mandates, some of which are already rendered obsolete by events.

For instance, the prison's previous medical-records management was repeatedly characterized by the district court in pejoratives ranging from inadequate and sloppy to non-existent for just about every facet of medical care offered. Implementing an electronic records system may well have "cured" those problems and many related deficiencies in prisoners' diagnostics and care. The changes wrought—e.g., electronic medical records, improved access to specialist consultants, and newly hired and better trained personnel—are synergistic, just as the district court stated their absence "cumulatively" indicated constitutionally deficient care. The Remedial Order, however, operates in a vacuum with respect to these significant changes. It does not satisfy the statutory duty to limit the court's supervision to actual "needs"; does not implement "narrow" solutions; and requires anything but the "least intrusive" ongoing judicial management.

The Plaintiffs were aware of the importance of applying the needs-narrowness-intrusiveness criteria in the Remedial Order. They urged the court to do a needs-narrowness-intrusiveness ruling after Defendants

appealed, but it refused.  In this court, however, the Plaintiffs contend that, because the Remedial Order instructs "special masters" to propose remedial plans, the district court will later evaluate the proposals, with the parties' input, in light of Section 3626(a)(1).  They also suggest that the court may alter its Remedial Order to account for ongoing changes to prison medical care.  Nothing in the record supports this theory.  The Judgment and Remedial Order plainly demonstrate the conclusion of the court's analysis, except for ongoing procedural review of the special masters' plans to "cure the violations" found in its rulings.  Moreover, the statute required the court not to "grant or approve any prospective relief" absent findings of needs, narrowness, and non-intrusiveness "to correct *the violation* of *the* Federal right."  18 U.S.C. § 3626(a)(1)(A) (emphasis added).  At the very least, this language favors application of the standard *before* entry of judgment, not as a product of ongoing, never-ending, serial implementation of changing decrees.  It is incontrovertible that the Remedial Order imposes "prospective relief," every item of which had to be evaluated under the PLRA's stringent standard.

## B.

The Remedial Order ignores the PLRA in commanding special master relief.  It immediately requires the Defendants to take the following steps: expeditiously cooperate with the court's appointment of three special masters; designate prison officials as "contact persons" with the masters to "coordinate and facilitate" their work; make prison facilities available to the masters and their delegates on 24 hours' notice; make all records and documents available "without delay" and within 14 days of request; and secure "reasonable access" to prisoners.  Unbelievably, the Remedial Order requires Louisiana to pay for the special masters' services.

Additional deviations from the PLRA's requirements pertain to the district court's attempt to designate three "special masters" to implement

No. 23-30825

its Remedial Order. The violations include the selection process for the special masters, the appointment of three rather than one master, and shifting the master's compensation to the state of Louisiana. Each violation requires discussion.

A "special master" is "*any* person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, *regardless* of the title or description given by the court." 18 U.S.C. § 3626(g)(8) (emphases added). The special master "*may* be authorized by a court to conduct hearings" or "to assist in the development of remedial plans." *Id.* § 3626(f)(6)(A), (f)(6)(C) (emphasis added).[10] Plaintiffs erroneously

---

[10] In relevant part, the pertinent provisions state:

(f) Special masters.—
    (1) In general.—
        (A) In any civil action in a Federal court with respect to prison conditions, the court may appoint a special master who shall be disinterested and objective and who will give due regard to the public safety, to conduct hearings on the record and prepare proposed findings of fact.
    . . . .
    (2) Appointment.—
        (A) If the court determines that the appointment of a special master is necessary, the court shall request that the defendant institution and the plaintiff each submit a list of not more than 5 persons to serve as a special master.
        (B) Each party shall have the opportunity to remove up to 3 persons from the opposing party's list.
        (C) The court shall select the master from the persons remaining on the list after the operation of subparagraph (B).
    . . . .
    (4) Compensation.—The compensation to be allowed to a special master under this section . . . shall be paid with funds appropriated to the Judiciary.
    . . . .

23

No. 23-30825

contend that the special masters contemplated by the district court are not within the PLRA because they will not exercise "quasi-judicial power." *See Benjamin v. Fraser*, 343 F.3d 35, 39–40, 45–46 (2d Cir. 2003), *overruled on other grounds by*, *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009); *see also Handberry v. Thompson*, 446 F.3d 335, 352 (2d Cir. 2006). The statute prescribes otherwise, because "any" person, "regardless" of title or description, may be designated a "special master" who "*may*" "assist in the development of remedial plans." That is what the court ordered here. Congress broadly described the position and duties of special masters to prevent easy evasion of the PLRA's further requirements for special masters. Applied in this case, the district court's "special masters" should have been selected and paid in accordance with the PLRA.[11]

---

    (6) Limitations on powers and duties.—A special master appointed under this subsection—
        (A) may be authorized by a court to conduct hearings and prepare proposed findings of fact, which shall be made on the record;
        (B) shall not make any findings or communications ex parte;
        (C) may be authorized by a court to assist in the development of remedial plans; and
        (D) may be removed at any time, but shall be relieved of the appointment upon the termination of relief.
(g) Definitions.—As used in this section—
. . . .
    (8) the term "special master" means any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court . . . .

18 U.S.C. § 3626 (emphases removed).

[11] Plaintiffs' effort to recharacterize the special masters as "experts" pursuant to Federal Rule of Evidence 706 is misguided because Federal Rules are subject to acts of Congress. In any event, the district court refused the Plaintiffs' motion to redesignate the special masters, which was filed only *after* the Defendants appealed.

Plaintiffs conceded that, if the court ordered "prospective relief" under the PLRA, and if the special masters' appointment was governed by that statute, then the court's selection process violated the statute. The PLRA's process requires courts to accept a list of up to five candidates each from the parties; each party may remove three candidates on the other party's list; and the court will select "a" special master from the remaining candidates. 18 U.S.C. § 3626(f)(2). The district court here ordered the parties to "meet and confer" to agree on one candidate for each of three positions, but if they cannot agree, to "submit up to three proposed names for each position," leaving the final decision to the court. The Remedial Order bears no relationship to the statutory process.

Also squarely at odds with the statute is the district court's requirement for "three" special masters, where the PLRA authorizes only "a" special master. 18 U.S.C. § 3626(f)(1)(A). Plaintiffs assert that the Dictionary Act, 1 U.S.C. § 1, allows statutory words of the singular to include several persons, parties, or things "unless the context indicates otherwise." But the Supreme Court explained that "[t]he Dictionary Act does not transform every use of the singular 'a' into the plural 'several'" because context is what matters. *Niz-Chavez v. Garland*, 593 U.S. 155, 164, 141 S. Ct. 1474, 1482 (2021). The context cuts against Plaintiffs' adaptation of the Dictionary Act here. Seven paragraphs of Section 3626(f) refer to "a" or "the" special master. 18 U.S.C. § 3626(f)(1)(A), (f)(1)(B), (f)(2)(a), (f)(3)–(6). Changing all these references to embrace multiple special masters would be grammatical legerdemain.

Finally, as Plaintiffs conceded in their initial brief, the Remedial Order violates the PLRA by requiring the State to pay the fees of the special masters. This is unbelievable, as noted before, because the statute orders compensation of special masters from the federal Judiciary appropriations. 18 U.S.C. § 3626(f)(4). In fact, the special master's hourly rate may "not

[be] greater than the hourly rate established under section 3006A for payment of court-appointed special counsel," together with reasonable costs. *Id.* But the district court ordered the Louisiana Department of Corrections to pay "[a]ll" their costs, without limitation.

In en banc briefing, Plaintiffs remain consistent with their position that all that's been done so far is "preliminary" and far from "final" adjudication by the district court. Thus, they contend that the district court might allow the masters' fee applications to be handled as in any other fee-shifting litigation. The state could then litigate the "reasonableness" of the fees and appeal adverse rulings. That is nonsense. The PLRA does not provide for adversarial testing of CJA-modelled (*i.e.*, government reimbursed) compensation for a special master. Inviting such litigation graphically demonstrates the disparity between the Plaintiffs' and district court's antiquated conception of institutional-reform litigation and the requirements of the PLRA. Congress disavowed the former procedures, so at odds with the structure of Federalism, precisely to maintain the possibility of prison reform while harmonizing it with judicial restraint and states' legitimate institutional concerns.

The district court's multiple deviations from the PLRA inexcusably thrust the Defendants into sweeping judicial oversight contrary to the statute. Equally inexcusably, other courts in this circuit have opted to replicate the district court's errors exactly. If the courts are to be governed by federal law, just as the state must abide by constitutional law, the PLRA must be strictly enforced.

## III.

Although the en banc court may reconsider every aspect of the district court's liability and remedial holdings, it is only necessary to point out the court's grave errors in addressing the remedial phase of the case. The Supreme Court holds that injunctive relief is inappropriate in prison-

conditions cases unless efforts to fix unconstitutional conditions are so lacking that they continue to reflect prison officials' deliberate indifference. *See Valentine*, 993 F.3d at 281–82; *Farmer*, 511 U.S. at 844–47, 114 S. Ct. at 1982–84. The court here used the wrong legal standard in gauging the status of LSP's medical care following watershed improvements. Repeatedly, its Remedial Opinion described the improvements as "robust" or partially corrective of problems described in the Liability Opinion. But repeatedly, the court held, they were "not enough" to cleanse the Defendants of deliberate indifference or remove the threat of future unconstitutional denial of adequate medical care. Moreover, the court erroneously refused to update its remedial analysis with evidence of critical reforms that LSP achieved in the seventeen months between the remedial trial and the Remedial Opinion. The district court also applied the wrong standard when addressing the prison's compliance with the ADA/RA. These errors reflect a fundamental misunderstanding of the purpose of injunctive relief in institutional-reform litigation. The Remedial Order must be vacated and remanded for a thorough reconsideration in light of the correct standards.

## A. Eighth Amendment

After the Defendants were found liable for Eighth Amendment and ADA/RA violations in every aspect of medical and disabled care provided to LSP inmates, they began systematically to upgrade the system. The court consequently allowed LSP to offer evidence of ongoing improvements from January 1, 2019, to May 31, 2022, before the ten-day remedial hearing in June 2022.

Another seventeen months elapsed until the Remedial Order issued. During that interval, the Defendants continued to upgrade medical care. They moved to supplement the record in November 2022, a year before the court's Remedial Order, to reflect that (1) LSP implemented electronic

healthcare records; (2) LSP was re-accredited by the American Correctional Association; (3) LSP hired an additional physician, doubling the number of physicians; and (4) LSP significantly increased the number of nurse practitioners. Reasoning that its pre-hearing discovery cutoff was just an ordinary exercise of trial court discretion, the court refused to consider this vital information. As a result, many provisions of the Remedial Order had become obsolete as soon as it was entered.

The district court's overarching error lay in its failure to evaluate whether prison medical and disabled care required injunctive relief despite continuously improved conditions. Since the 1970s, the Supreme Court has held that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976) (citation omitted). Such mistreatment amounts to unconstitutional "punishment" under the Eighth Amendment. *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc). To effectuate liability based on "punishment," *Williams* noted, the Supreme Court's test for deliberate indifference adopted a criminal standard of recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839–40, 114 S. Ct. at 1979–80). The test has two parts: plaintiffs' "objective exposure to a substantial risk of serious harm"; and "that prison officials acted or failed to act with [subjective] deliberate indifference to that risk." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018). But, as the Supreme Court[12] and this court have consistently held, this quasi-criminal standard is not met for mere negligence or a failure

---

[12] *Gamble*, 429 U.S. at 105–06, 97 S. Ct. at 292 ("inadvertent failure to provide medical care" or negligent diagnoses do not establish a constitutional violation); *Wilson v. Seiter*, 501 U.S. 294, 305, 111 S. Ct. 2321, 2328 (1991) ("mere negligence" does not establish a constitutional violation); *Farmer*, 511 U.S. at 844, 114 S. Ct. at 1982–83 (officials are not deliberately indifferent if they "responded reasonably to the risk" of serious harm).

to meet a standard of community care or even gross negligence.[13] In essence, when prison officials have attempted to care for a prisoner's medical needs, even if the care falls short, they have not exhibited subjective deliberate indifference.

Just as important, a federal court, after initially finding liability, may not simply order remedial injunctive relief that supplants prison management with federal oversight. Well before passage of the PLRA, the Supreme Court had made this abundantly clear. Thus, deliberate indifference "'should be determined in light of the prison authorities' current attitudes and conduct': their attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 845, 114 S. Ct. at 1983 (quoting *Helling v. McKinney*, 509 U.S. 25, 36, 113 S. Ct. 2475, 2482 (1993)); *see also Bell v. Wolfish*, 441 U.S. 520, 547–48, 562, 99 S. Ct. 1861, 1878–79, 1886 (1979). Further, "to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Farmer*, 511 U.S. at 846, 114 S. Ct. at 1983. Both sides may rely on ongoing developments in the prison to establish that the inmate is not entitled to an injunction. *Id.*

---

[13] *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."); *Brauner v. Coody*, 793 F.3d 493, 498 (5th Cir. 2015) ("Deliberate indifference is not established when 'medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials.'") (citation omitted); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("Deliberate indifference 'is an extremely high standard to meet.'" (citation omitted)); *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013) ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." (citation omitted)); *Mendoza v. Lynaugh*, 989 F.2d 191, 192 (5th Cir. 1993) ("[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference"); *see also Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009).

No. 23-30825

Citing *Farmer*, this court held that, "[w]hen there is a possible constitutional violation that is likely to continue over time as in a prison injunction case, we consider the evidence from the time suit is filed *to the judgment*." *Valentine*, 993 F.3d at 282 (emphasis added). *Valentine* concluded that "[i]njunctive relief is forward looking, and given the Defendants' response [to the COVID-19 pandemic] including actions taken on the eve of and during trial, the permanent injunction is not warranted." *Id.* at 289. Even more pointedly, this court held that a district court properly considered conditions after trial when it refused to impose injunctive relief in a Mississippi prison case where extensive improvements had been made in the interim. *Dockery v. Cain*, 7 F.4th 375, 379 (5th Cir. 2021). This court quoted *Farmer*'s admonishment that a court "should approach issuance of injunctive orders with the usual caution" and "may . . . exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction." *Id.* (quoting *Farmer*, 511 U.S. at 846–47, 114 S. Ct. at 1984). And we emphasized *Farmer*'s "restrained approach" "to prevent federal courts from 'becoming enmeshed in the minutiae of prison operations.'" *Id.* (some internal quotations omitted) (quoting *Farmer*, 511 U.S. at 847, 114 S. Ct. at 1984). Finally, *Dockery* rejected Plaintiffs' position that district courts must make a risk-of-recurrence finding. *Id.* at 380.[14]

The district court's failure to apply these principles is unjustified. To begin, the court's refusal to update remedial conditions from May 2022 to the date of its Remedial Order in November 2023 violated *Farmer*, *Valentine*,

---

[14] *See also Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002) ("[I]n the absence of a 'current and ongoing' violation, there is no occasion to fashion prospective relief to cure the violation. In other words, if a violation no longer exists, the statute [PLRA] does not permit the court to order prospective relief." (citing 18 U.S.C. § 3626(a)(1)(A))); *but cf. Porter v. Clarke*, 923 F.3d 348, 366–68 (4th Cir. 2019); *Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010). *Porter* and *Thomas* disagreed with *Hallett*'s reading of the PLRA.

and *Dockery*. The district court asserted its right to manage its docket, set deadlines, and protect the Plaintiffs from an endless loop of evidence. As the court noted, the foregoing authorities acknowledge a district court's discretion. Particularly, however, the court relied on the Supreme Court's decision in *Brown v. Plata*, 563 U.S. 493, 131 S. Ct. 1910 (2011). *Plata*, a case about prison overcrowding, refused to require that the state of California's request to update remedial evidence be accepted where (1) the state failed to show what additional evidence it would have submitted; and (2) the state's prison operation had been in receivership under a court decree for over a decade. *Id.* at 522–24, 131 S. Ct. at 1935–36. *Plata* is distinguishable. In LSP's case, there was an extended delay between the remedial hearing and the Remedial Order that could easily have supported supplemental briefing by both parties or even limited discovery by Plaintiffs. Further, LSP had no history of court oversight before the remedial hearing, and the Defendants explained exactly what post-hearing remedial measures had been taken and their importance to any potential remedial decree.

As a result, the court's Remedial Opinion completely ignored that, as of autumn 2022, LSP had fully installed its electronic health-records system, and by January 2023, the Defendants hired an additional staff physician and increased the number of nurse practitioners from seven to nine. These indisputable facts related directly to deficiencies that the court found in its Liability Opinion and continued to assert in the Remedial Opinion. Indeed, deficiencies in staffing and recordkeeping underlie a large number of the court's liability findings. One might think that the Defendants' efforts to cure some of the most significant sources of inadequate medical care would be explored by the district court, not rebuffed. As in *Dockery*, the court could easily have accepted further briefing or reopened limited discovery. *Dockery v. Hall*, 443 F. Supp. 3d 726, 736 (S.D. Miss. 2019), *aff'd sub nom.*, *Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021).

No. 23-30825

Moreover, if the district court's current injunctive order takes effect and requires special masters to address the issues listed in the Remedial Orders, a significant portion of those issues will have been dealt with even before the Remedial Order issued.[15] Any court-appointed master will be striking at straw men, needlessly interfering with prison authorities' duties, and running up bills for no constitutional remedial purpose. The court's failure to incorporate significant medical care improvements into its Remedial Opinion and Remedial Order violated this court's precedents and constituted an abuse of discretion.

The court also fatally erred by finding ongoing subjective deliberate indifference in support of its broad injunction. As noted above, "[d]eliberate indifference is an 'extremely high' standard to meet." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). The Defendants' remedial efforts may prove insufficient to cure all the identified institutional problems, but they indicate concern and sincerity on the part of prison officials that negate subjective indifference. *Farmer*, 511 U.S. at 844, 114 S. Ct. at 1982–83 ("[P]rison officials . . . may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." (emphasis added)); *Hinds Cnty.*, 120 F.4th at 1261 ("A reasonable response to inadequate prison conditions is indeed sufficient to prevent a deliberate-indifference finding even if the County's attempts were unsuccessful or if the County did not choose the optimal approach to the problem."). Yet the district court relied heavily

_____

[15] Within five of the seven Remedial Order sections pertaining to medical care, the terms "documentation" and "charting" appear ubiquitously and include patient history, treatment records, medication administration, and specialist referrals. One section is actually titled, "Standards and Procedures for medical records management, including electronic medical records and protocols for providing real time or contemporaneous access to medical records by outside providers, specialists, and related disciplines."

on outdated and out-of-circuit district-court cases[16] rather than this court's multiple authorities in concluding that none of LSP's remedial measures sufficed to narrow, much less eliminate, the need for broad ongoing injunctive relief.

In the Remedial Opinion, the court repeatedly acknowledged but then discounted improvements in the following areas of prison medical care.

1. Clinical care. The court found that LSP had remedied three out of five deficiencies noted in the Liability Order, but the medical records were still "in shambles." This problem, of course, was solved after the remedial hearing by electronic health records but went unacknowledged by the court. The court criticized the "episodic treatment" of medical complaints, despite the hiring of an additional nurse practitioner and adoption of a web-based medical service. The court illustrated "constitutionally substandard care" by means of three examples of delayed care, "medical errors," and a holding that a "mere encounter with a medical health care provider is not evidence of medical care or treatment." These findings ignore the very high bar required to establish ongoing deliberate indifference of the Defendants. *See Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001); *Valentine*, 993 F.3d at 281; *see also Mendoza v. Lynaugh*, 989 F.2d 191, 192 (5th Cir. 1993).

---

[16] The court quoted *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002), and cited *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1260 (M.D. Ala. 2017), for the proposition that "[e]fforts to correct systemic deficiencies that 'simply do not go far enough,' when weighed against the risk of harm" constitute deliberate indifference. *Remedial Opinion*, 701 F. Supp. 3d at 435–36; *but see Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (The subjective inquiry must leave room for the possibility that prison officials "responded reasonably to the risk, even if the harm ultimately was not averted." (quoting *Farmer*, 511 U.S. at 844, 114 S. Ct. at 1982–83)).

2. Sick call. After the Liability Opinion issued, LSP completely overhauled its sick-call procedures. As the evidence shows, each patient was being seen within one day by an EMT; nurse practitioners became available through telemedicine; and medical records were available. Nonetheless, the court held the changes had not "transformed the system" and, in the case of telemedicine, were "not optimal." This analysis is unmoored to the rigorous Eighth Amendment standard, particularly because it disregarded that substantial improvements should have eliminated any finding of ongoing deliberate indifference. *See Hinds Cnty.*, 120 F.4th at 1261 (citing *Farmer*, 511 U.S. at 844–45, 114 S. Ct. at 1982–83); *Rasho v. Jeffreys*, 22 F.4th 703, 711 (7th Cir. 2022) (Even if a prison "could have done more," corrective efforts "demonstrate a commitment to addressing the problem—the antithesis of the callous disregard required to make out an Eighth Amendment Claim.").

3. Specialty care. LSP expanded its onsite specialty clinics from four to thirteen; made telemedicine consultations available; substantially increased the number of specialty referrals and appointments and reduced the number of missed appointments; took steps to schedule and track appointments more closely; installed monitors in the disabled dorms to notify inmates of upcoming appointments; and worked to coordinate care and provide adequate follow-up patient care after specialty workups. This "framework for constitutionally adequate health care," as the district court described it, was still not enough. The court instead focused on a handful of specific cases in which allegedly poor medical treatment occurred. But the fact that some improvements may not have provided "optimal care" does not detract from the important advances that were made by Defendants, which negated a legitimate finding of ongoing deliberate indifference. *See Gobert*, 463 F.3d at 349.

4. Emergency care. After the Liability Opinion found staffing in LSP's emergency-care unit to be constitutionally inadequate, LSP revised

its staffing. An RN and EMT are now present 24/7, with a nurse practitioner either present in the unit or on-call on prison grounds 24/7. LSP also altered the policy for self-declared emergencies and limited EMTs' discretion to ensure proper oversight. The court acknowledged "improved staffing in the [emergency unit]" but continued to find constitutionally deficient care based on seven patient files. Again, the court failed to consider that LSP's response may be less than transformative but sufficient to dispel the notion of deliberate indifference. *See Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016). Nor did it apply the caselaw that disagreements over medical judgment or isolated negligence may constitute medical malpractice but do not rise to the level of quasi-criminal deliberate indifference. *See Gamble*, 429 U.S. at 106, 97 S. Ct. at 292; *Williams*, 797 F.3d at 281; *Domino*, 239 F.3d at 756.

5. Inpatient/Infirmary care. The district court "commended" Defendants for upgrading staffing in the acute-care unit to one RN for every ten patients and one RN for every fifteen long-term care patients. Staffing shortages, which led to the misuse of orderlies for nursing tasks, was the court's concern in the Liability Opinion. But again, the district court found the integration of additional trained nurses inadequate due to occasional lapses. LSP also installed red call buttons outside the door of each prisoner's locked room to improve communications with nursing staff, and national guidelines prescribe that patients be within sight *or sound* of nurses. But the court nonetheless found the call buttons inadequate to satisfy its erroneous view of constitutional standards. *See Jeffreys*, 22 F.4th at 711.

6. Medical Leadership/Organizational Structure. It seems a dubious proposition that a federal court may hold that a state institution's governing organizational structure—as opposed to actions of identified leaders in the structure—is unconstitutional. *See Wilson*, 501 U.S. at 305, 111 S. Ct. at 2327. But that was the import of the district court's Liability Opinion. Responding

to those concerns, however, LSP fired old leaders, hired new leaders, and instituted new oversight procedures for prison medical care. The new healthcare administrator meets regularly with the new Deputy Warden, a licensed practical nurse. LSP implemented a weekly backlog tracker to identify delays, and the doctors meet daily with nurse practitioners and LSP's medical department heads. The court discounted these developments because, it claimed, understaffing persists, the improvements "simply do not go far enough," and leadership "disagreed with several of the Court's liability findings." The court disagreed with LSP's protocol for conducting mortality reviews. The court also discounted changes that were made to the quality assurance/quality improvement ("QA/QI") programming due to the Liability Opinion's criticism; the court held that LSP lacks "empirical evidence" that the program is effective. Finally, the court found the QA/QI programming lacked attention to "remedying constitutional deficiencies." Nonsense. Contrary to the court's conclusion, a layman may "disagree" with any court's ruling yet not be deliberately indifferent to the patients' needs. And nothing in the court's vague critique of the QA/QI programming identified exactly which "constitutional deficiencies" had to be addressed by means of a bureaucratic program.

* * *

None of these Remedial Opinion complaints, coupled with the affirmative changes made by Defendants, rises to the level of showing ongoing deliberate indifference by the Defendants. *See Gobert*, 463 F.3d at 346. That is especially true, given that the American Correctional Association ("ACA") reaccredited LSP in August 2024 after the prison satisfied 100% of 64 mandatory standards and 98.98% of the nonmandatory standards set forth by the ACA.

No. 23-30825

## B. ADA/RA Compliance

As with the Eighth Amendment, the district court made the same kind of mistakes in regard to LSP's alleged violations of the ADA/RA. In particular, the district court's Remedial Opinion continually discounted improvements that it knew had been made for the benefit of disabled prisoners. The district court's analysis of "failure to accommodate" and "programmatic accommodations" substituted its view of prison management for the statutory standard, which allows some institutional flexibility in providing for disabled prisoners' needs. In short, the district court created its own preferred standard of medical care for the prison.

What the district court failed to acknowledge is that "the 'ADA does *not* set out a standard of care for medical treatment,' and the 'ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.'" *Carter ex rel. Carter v. City of Shreveport*, 144 F.4th 809, 815 (5th Cir. 2025) (emphasis in original) (quoting *Hale v. Harrison Cnty. Bd. of Supervisors*, 8 F.4th 399, 404 n.† (5th Cir. 2021) (per curiam)); *Bell v. State Prison Offs.*, No. 23-30339, 2024 WL 2863293, *6 (5th Cir. June 6, 2024) (per curiam) (unpublished) ("The ADA is a *discrimination* statute, not merely a recourse-for-failure-to-treat statute." (emphasis in original)); *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012) ("The ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."). Even the Supreme Court refused to hold that the ADA imposes a "standard of care" on States. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14, 119 S. Ct. 2176, 2188 n.14 (1999) ("We do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to provide a certain level of benefits to individuals with disabilities." (some internal quotations omitted)).

37

No. 23-30825

As a result, the district court's Remedial Opinion went too far. Although ADA/RA remedies are not subject to the PLRA, the court's micromanagement of the prison's facilities, personnel, procedures, and standards of care require reconsideration.

* * *

For all these reasons, the district court was made aware of a substantial risk of serious legal error that could arise from discounting the Defendants' innovations and improvements to prison medical care and disability care that were made during the remedial phase and post-trial, but it chose to ignore the risk. Likewise, it chose to ignore that ongoing improvements and innovations gave rise to a strong legal likelihood that the Defendants were not guilty of continued deliberate indifference or disability discrimination. The district court, in sum, was deliberately indifferent to both the evidentiary and legal framework that bound it. This court, following the Supreme Court, must maintain a delicate balance among the prerogatives of public institutions, the demands of federalism, and the judiciary's limited remedial role. The court's Remedial Order fails as a matter of law.

## CONCLUSION

The judgment of the district court is VACATED and REMANDED for further proceedings consistent herewith.

No. 23-30825

PRISCILLA RICHMAN, *Circuit Judge*, concurring in part and dissenting in part:

I concur in JUDGE JONES' opinion for the en banc court with the exception of the opinion's conclusions regarding Eighth Amendment violations, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA).

Even after the considerable remediation efforts undertaken by the Louisiana State Penitentiary (LSP), the record reflects what I consider to be deliberate indifference with regard to the serious medical needs of at least two inmates.[1] The district court identified those inmates as Patient #4 and Patient #10.[2] It is not clear whether two, a few, or several instances of deliberate indifference require prospective injunctive relief and if so, how such relief might be tailored. I would remand to the district court for further consideration of the scope of injunctive relief, if any is necessary, to address prospective shortcomings such as these two instances in the medical treatment of inmates, bearing in mind that under the Prison Litigation Reform Act (PLRA), "any prospective relief . . . must be narrowly drawn, [must] extend[] no further than necessary to correct the violation of the Federal right, and [must be] the least intrusive means necessary to correct the violation of the Federal right."[3] The PLRA further requires that "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."[4]

---

[1] *See* ROA.30587-89.

[2] ROA.30587-89.

[3] 18 U.S.C. § 3626(a)(1)(A).

[4] *Id.*

No. 23-30825

As to the ADA and RA, the district court concluded that LSP failed to accommodate inmates with regard to disciplinary procedures, not medical care.[5] The en banc court's majority opinion does not address these conclusions. There is evidence of ADA and RA violations. Accordingly, I do not concur in the majority opinion in this regard.

_____

[5] *See* ROA.22513-14, 30641-45.

No. 23-30825

HAYNES, *Circuit Judge*, dissenting, joined by STEWART, GRAVES, HIGGINSON, DOUGLAS, and RAMIREZ, *Circuit Judges*:

I respectfully dissent from the majority opinion's exercise of jurisdiction over this appeal.[1] We do not have jurisdiction under either 28 U.S.C. § 1291 or § 1292(a)(1).[2] Accordingly, this appeal should be dismissed.

First, we do not have jurisdiction under 28 U.S.C. § 1291, which gives us jurisdiction over "appeals from all final decisions of the district courts of the United States." "A final judgment is normally deemed not to have occurred until there has been a decision by the district court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989) (citation modified). "A court's ruling is only final if the judge intends to have nothing further to do—with the motion (if an interlocutory appeal) or the case (if a conventional appeal)." *Ueckert v. Guerra*, 38 F.4th 446, 450 (5th Cir. 2022) (citation modified).

Here, there is no final decision. The Remedial Order makes clear that the district court did not "intend[] to have nothing further to do." *Id.* (citation modified). Rather, the Remedial Order expressly contemplates that

_____

[1] If jurisdiction were proper in this case, I would remand the case to the district court but, unlike the majority opinion, I would not make rulings on what has already been done but rather request the district judge to take another look to make proper determinations at this point given that the district court has been stayed for quite some time by this court.

[2] A more fulsome discussion of our lack of jurisdiction, which I agree with and echo here, was included in the panel majority opinion. *Parker v. Hooper*, 128 F.4th 691 (5th Cir. 2025) (per curiam).

the district court will conduct further action in the case, providing actions the district court "will" take.[3]

The document entered by the district court labeled "Judgment" also does not confer appellate jurisdiction under § 1291 because it does not "end[] the litigation on the merits."[4] *Midland Asphalt*, 489 U.S. at 798 (citation modified). Instead, the "Judgment" states that the district court "retains jurisdiction over the procedures set forth in [its] Remedial Order." A document labeled "Judgment" does not close the case, even if it purports to do so, where the case is not actually finished. *See Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956) ("The District Court cannot, in the exercise of its discretion, treat as 'final' that which is not 'final' within the meaning of § 1291."). Therefore, there is no final decision over which we can exercise appellate jurisdiction under § 1291.

Second, we do not have jurisdiction under 28 U.S.C. § 1292(a)(1), which gives us appellate jurisdiction over interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." A court order "relat[ing] only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988). Where an order "is merely a step in the litigation process and is in no way directed to the merits of the underlying action, the order is not appealable under

---

[3] For example, the Remedial Order says the district court "will appoint three Special Masters to prepare proposed Remedial Plans" and "will review the proposed Remedial Plans and any requests for amendment and will enter Orders necessary and appropriate to effect remedies."

[4] The "Judgment" awards no relief. It merely states that "Judgment is hereby entered" and "[t]his matter shall be closed by the Clerk of Court."

No. 23-30825

§ 1292(a)(1)." *S. Ute Indian Tribe v. Leavitt*, 564 F.3d 1198, 1206 (10th Cir. 2009) (quoting *Lewis v. Bloomsburg Mills, Inc.*, 608 F.2d 971, 973 (4th Cir. 1979)) (citation modified).

Here, the Remedial Order is not an appealable injunction under § 1292(a)(1) because it does not identify, much less grant, any injunctive relief. Indeed, the Remedial Order does not impose any substantive obligation upon Defendants regarding medical care, the Americans with Disabilities Act, or the Rehabilitation Act of 1973. As the district court has not yet appointed a special master, Defendants' only obligation under the Remedial Order, absent the stay, would be to propose names of potential special masters. This is not an injunction, but instead a court directive advancing the litigation. Further, the Remedial Order's requirements regarding cooperation with the special masters would likewise not be injunctive. *See S. Ute Indian Tribe*, 564 F.3d at 1207 (stating that although an order "may be characterized as an order to do something, it is no more an 'injunction' than is an order to turn over papers in discovery or submit to a physical examination" (citation omitted)). Because the Remedial Order is not an injunction, we lack appellate jurisdiction under § 1292(a)(1).

We do not have appellate jurisdiction, and this appeal should be dismissed. Accordingly, I respectfully dissent.

43

No. 23-30825

STEPHEN A. HIGGINSON, *Circuit Judge*, dissenting, joined by STEWART, GRAVES, DOUGLAS, and RAMIREZ, *Circuit Judges*:

"Appeal gives the upper court a power of review, not one of intervention." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Today, the majority defies this foundational principle. It turns Congress's constraints on our jurisdiction inside out so it can erase multi-year, class action district court litigation that first confirmed and then sought to address proven, persistent unconstitutional medical care failures, which resulted in at least six preventable deaths at the Louisiana State Penitentiary at Angola.[1] In doing so, the majority sidesteps Supreme Court case law, overlooks our own precedent, and splits with our sister circuits to construct a new, district-court-stripping rule of appellate intervention against institutional litigation.

The majority asserts that we have jurisdiction through "either" Section 1291 "or" Section 1292(a)(1) to address the merits of this case, in the first instance, by the en banc court. Given the lack of finality in this litigation, I focus this opinion on my concerns regarding Section 1291, but I also agree with JUDGE HAYNES that Section 1292(a)(1) straightforwardly does not confer jurisdiction over this appeal.[2] I do not address the merits because we

---

[1] Chief Judge Dick's careful and detailed opinions are these: the Liability Opinion, *Lewis v. Cain*, No. 3:15-cv-318, 2021 WL 1219988 (M.D. La. Mar. 31, 2021), and the Remedial Opinion, *Lewis v. Cain*, 701 F. Supp. 3d 361 (M.D. La. 2023). For the district court's own summary of some of its factual findings, see the Appendix to this opinion.

[2] To supplement both the clear directive from *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988), that "[a]n order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)"—which the majority does not cite—and our sister circuits' law discussed in JUDGE HAYNES's dissent, I offer these additional authorities: *Groseclose v. Dutton*, 788 F.2d 356, 359–61 (6th Cir. 1986) (per curiam); *Spates v. Manson*, 619 F.2d 204, 209–10 (2d Cir. 1980); *Taylor v. Bd. of Educ.*, 288 F.2d 600, 603–06 (2d Cir. 1961); *In re City of Springfield*, 818 F.2d 565, 567–68 (7th Cir.

No. 23-30825

lack jurisdiction to do so, and the parties did not present any merits arguments to the en banc court. I add only one further note relating to the substance of this appeal, a reminder from the Supreme Court: "Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

\* \* \*

Starting with Supreme Court case law, the majority mentions *Riley v. Kennedy*, 553 U.S. 406, 419 (2008), only in passing to then say that "common sense" compels the majority's conclusion. In *Riley*, as the majority notes, the Supreme Court did caution that a district court's labeling of an order does not control its appealability. *Id.* But this selective reading ignores the fundamental rule of finality, repeated in *Riley*: "A final judgment is 'one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Id.* (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)). The majority also disclaims the Supreme Court's workable bright-line rule instructing appellate courts *not* to bifurcate the liability and remedial stages of litigation in district courts: "We have long held that an order resolving liability without addressing a plaintiff's requests for relief is not final." *Id.*

---

1987); *Garzaro v. Univ. of P.R.*, 575 F.2d 335, 337 (1st Cir. 1978). Furthermore, we know that Congress did not intend for our jurisdiction to include appeals of injunctions between the liability and remedy phases because Congress expressly provided for such appeals in the admiralty context in Section 1292(a)(3), without granting such jurisdiction in any other arena. *See* 28 U.S.C. § 1292(a)(3); *see also Beluga Holding, Ltd. v. Com. Cap. Corp.*, 212 F.3d 1199, 1203 (11th Cir. 2000); *cf. Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 113–14 (2009) (emphasizing that "rulemaking, 'not expansion by court decision'" is Congress's "preferred means for determining whether and when prejudgment orders should be immediately appealable" (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 48 (1995))).

No. 23-30825

Our own settled law reflects these same principles. "'[A] final decision is one by which a district court disassociates itself from a case' and 'terminates an action.' Accordingly, a final order must also specify the *remedies* that the victorious plaintiffs will receive." *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 329–30 (5th Cir. 2022) (alteration adopted) (quoting *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408–09 (2015)); *see also Gross v. Keen Grp. Sols., L.L.C.*, 18 F.4th 836, 839–40 (5th Cir. 2021) ("For purposes of Section 1291 a decision is final only if it 'ends the litigation on the merits and leaves nothing for the court to do but execute judgment.'" (quoting *Cook v. City of Tyler*, 974 F.3d 537, 539 (5th Cir. 2020))); *Ueckert v. Guerra*, 38 F.4th 446, 450 (5th Cir. 2022).

The Remedial Order neither ended the litigation to divorce the district court from this case nor specified the remedies that could follow. To the contrary, the Remedial Order expressly contemplates further action at the district court in a series of at least seven steps. It provides first that the parties must meet and confer and then submit names of proposed special masters. After those proposals, the district court would appoint special masters.[3] Only after they had been appointed would the parties be required to cooperate with the special masters and provide them access to the penitentiary. And then, after the special masters reviewed the facility's current conditions and operations, they would submit a proposed remedial plan to the district court. At that point, the parties would have an opportunity to file proposed amendments to the plan. Then, finally, the district court might issue a

---

[3] I use the plural "special masters" for readability because it is consistent with the district court's order, but, in not reaching the merits, I express no opinion on the parties' arguments about, or the majority's analysis of, whether a singular special master or multiple special masters would be appropriate in this case.

remedy in this case.[4]  With over a half dozen steps before a final order would require the defendants to change their practices, the district court clearly anticipated this litigation continuing before it.

Rather than engage with this well-established jurisprudence, the majority finds and magnifies a footnote from an opinion that we have never applied to assert jurisdiction under Section 1291.[5]  *See Morales v. Turman*, 535 F.2d 864, 867 n.6 (5th Cir. 1976), *rev'd on other grounds*, 430 U.S. 322 (1977).[6] *Morales* is not factually applicable to this case.  There, the district court's order required "that any plan submitted must be consistent with the minimum requirements laid out in its opinion."  *Id.*  Our court found that the "minimum standards" were not "mere guidelines subject to further negotiation by the parties."  *Id.*  By contrast, here, the plan to be submitted after investigations of the facility would be subject to review and proposed amendments by the parties—as well as an additional consultation between

---

[4] The majority distorts the Remedial Order by insisting that it directs special masters to "cure and eliminate" constitutional violations.  Only after the district court had entered a final remedial plan, however, would the special masters be tasked with monitoring "implementation of" that plan "to cure and eliminate the violations found in the Court's Liability Ruling and Remedial Ruling."

[5] In its fifty-year history, *Morales* has been used in discussing appellate jurisdiction just twice, and in both instances, only in finding jurisdiction under Section 1292(a)(1).  *See United States v. Texas*, 601 F.3d 354, 362 (5th Cir. 2010); *Johnson v. Gambrinus Co.*, 116 F.3d 1052, 1057 (5th Cir. 1997).

[6] Two years after *Morales*, we reflected on finality for appeals in *Freeman v. Califano*, 574 F.2d 264, 266 (5th Cir. 1978) (per curiam): "Finality as a condition of review is an historic characteristic of federal appellate procedure."  In doing so, we noted that "judicial administration must not be leaden-footed.  Its momentum would be arrested by permitting separate review of the component elements in a unified cause."  *Id.*  Here, the district court has ensured careful consideration of this case with "years of discovery, 21 days of trial, and two site visits to Angola by the Court," which might eventually culminate in a remedial plan.  *Lewis*, 701 F. Supp. 3d at 378 (footnotes omitted).  Our intervention halted that progress and has created great additional delay.

the parties "in an effort to agree upon proposed amendments"—before an implementing order from the district court. Additionally, the "minimum standards" in *Morales* were "extremely detailed" and included requiring the facility to administer specific types of IQ tests, to enlist a language pathologist, and to hire psychologists with certain degrees. *Morales v. Turman*, 562 F.2d 993, 997 (5th Cir. 1977); *see also Parker v. Hooper*, 128 F.4th 691, 698 (5th Cir. 2025) (per curiam). Unlike the order in *Morales*, the Remedial Order does not establish minimum standards; it only identifies the constitutional violations that an eventual remedial plan would target, taking into account developments at the facility after the Remedial Opinion and Remedial Order were issued. *See Parker*, 128 F.4th at 699 & n.8.

Next, on the persuasive authority front, the majority acknowledges that its inversion of Section 1291's constraint into an expansive new rule of interlocutory appellate intervention has been rejected by our sister circuits. But the majority overlooks the depth of the conflict we create by citing only Ninth Circuit case law. At least six other circuits also counsel against asserting jurisdiction. For example, in *Groseclose v. Dutton*, 788 F.2d at 358–61, the Sixth Circuit held that neither Section 1291 nor Section 1292 conferred appellate jurisdiction over an order requiring the parties to submit "the name of an individual to serve as special master" and "a remedial plan" for improving conditions of confinement for prisoners sentenced to death. The court reasoned that the parties could use "a variety of alternatives" to improve conditions, leaving significant case development for the district court to handle before an appeal would be appropriate. *Id.* at 360; *see also Navarro-Ayala v. Hernandez-Colon*, 956 F.2d 348, 350–51 (1st Cir. 1992); *Taylor*, 288 F.2d at 602–03; *Inmates of Allegheny Cnty. Jail v. Wecht*, 874 F.2d 147, 155–56 (3d Cir. 1989), *vacated on other grounds*, 493 U.S. 948; *El-Tabech v. Gunter*, 992 F.2d 183, 185 (8th Cir. 1993); *Jackson v. Fort Stanton Hosp. & Training Sch.*, 964 F.2d 980, 987–89 (10th Cir. 1992).

As those circuits' cases—and our own precedent—demonstrate, "[t]he effect of [Section 1291] is to disallow appeal from any decision which is tentative, informal or incomplete. . . . So long as the matter remains open, unfinished or inconclusive, there may be no intrusion by appeal." *Cohen*, 337 U.S. at 546. In its appetite to turn what is non-final into something final in order to dead-end the district court's efforts to uphold the Constitution, the majority fails to acknowledge, much less apply, the three-prong test that the Supreme Court painstakingly requires before intermediate appellate courts can enter, and invalidate, midstream, district court proceedings.

Under *Cohen*, only a "narrow class" of non-final orders is appealable, and only when an intermediate appeal serves "the interest of 'achieving a healthy legal system.'" *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (quoting *Cobbledick v. United States*, 309 U.S. 323, 326 (1940)); *see also Cohen*, 337 U.S. at 546–47. Those orders must satisfy three conditions: they must (1) be "conclusive," (2) "resolve important questions completely separate from the merits," and (3) "render such important questions effectively unreviewable on appeal from final judgment in the underlying action." *Digit. Equip. Corp.*, 511 U.S. at 867. Failure on any one of the *Cohen* prongs is "fatal." *GEO Grp., Inc. v. Menocal*, 146 S. Ct. 774, 781 (2026).

Our court's new rule of sweeping and interventionist appellate jurisdiction fails all three.

The Remedial Order immediately falters on the first two prongs. There has been no conclusive determination as to the remedies in this case, and while the merits of this case involve substantial rights, the non-final

No. 23-30825

Remedial Order does not.[7]  As discussed above, it contemplates that the parties meet and confer and submit nominations for special masters who, eventually, will submit information and recommendations to the district court.  To be crystal clear, there is *no* current legal order imposing *any* obligation on the defendants to change *any* aspect of their prison medical care.

On the third and final prong, our court's premature dictate of an outcome not only overlooks that appellate review would of course exist after a final judgment, but also actually removes an additional layer of appellate review at the district court level.  Even accepting the majority's premise that the special masters contemplated in the Remedial Order must be within the PLRA, those special masters are "appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure."  18 U.S.C. § 3626(g)(8).  Rule 53 guarantees parties de novo review of a special master's findings before the district court.  *See* Fed. R. Civ. P. 53(f)(3); *see also Fid. Tr. Co. v. Bd. of Educ.*, 174 F.2d 642, 645 (7th Cir. 1949) (holding that an order providing for reference to a special master was not an appealable final order because it "clearly contemplated further action by the court"); *Sick v. City of Buffalo*, 574 F.2d 689, 692–94 (2d Cir. 1978).

---

[7] The majority seems to see diminution of substantial rights in meeting and conferring and giving special masters access to the penitentiary.  Like the panel majority, I see these requirements as more akin to a discovery order.  *Parker*, 128 F.4th at 696–97.  The majority reasons that the Remedial Order is final and distinct from a discovery order because the parties are "likely subject to contempt" if they disobey the order, but the possibility of contempt does not indicate finality or an injunctive quality.  It is well established that a finding of contempt is required before a party can appeal a discovery order.  *See, e.g.*, *Piratello v. Philips Elecs. N. Am. Corp.*, 360 F.3d 506, 508 (5th Cir. 2004) (per curiam) ("[A] party that wishes to immediately appeal a discovery order 'must first refuse compliance, be held in contempt, and then appeal the contempt order.'" (alteration adopted) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 18 n.11 (1992))).

No. 23-30825

The Remedial Order acknowledges this additional review and permits the parties to submit amendments to the special masters' proposed remedial plans, which the district court would review before entering any "Orders necessary and appropriate to effect remedies." One irony of this case is that the majority repeatedly faults the district court for failing to adequately consider the improvements the defendants have already made, but the special masters' assessment would necessarily consider those improvements as they examined current conditions and practices. Indeed, the district court's order was patient and protective of Louisiana's insistence that it could show it had already rectified its dire prison conditions. The district court denied the plaintiffs' request for immediate remedial intervention after Louisiana contended that it could show its current conditions militated against remedial measures. But the majority mistakes district court restraint for finality.

Finally, and most concerning, the majority downplays its own adventurism by saying we will only deploy muscular appellate interventionism against district court inquiries into constitutional violations—before present facts are confirmed and appropriate remedies are issued—when those violations are institutional in breadth. Thus, our new exception to Section 1291's constraint *against* appellate intervention will only apply, it seems, when constitutional violations are particularly egregious and widespread because they are institutionally entrenched and lasting.[8]

Section 1291 is not a weapon for an appellate court to invalidate ongoing, responsible district court litigation it disfavors. *Cf. M.D. ex rel.*

---

[8] This inversion of Section 1291 is most disturbing when the majority cites, as purported support, a law review article that describes our court's opposite effort, intervening *to protect* constitutional rights against institutional violations.

51

No. 23-30825

*Stukenberg v. Abbott*, 132 F.4th 770, 773–75 (5th Cir. 2025) (dissenting from denial of rehearing en banc).

I fear that our decision today not only upends Supreme Court and circuit law but also guarantees the harm Section 1291 exists to prevent. Our court now has given itself license to intervene, supplanting the role of district courts, to stop inquiry into the worst constitutional violations. After scant months of en banc attention to appellate jurisdiction, we undermine years of fact-finding of constitutional violations that led to multiple preventable deaths and significantly more unfathomable pain and suffering.[9] One harrowing example is the death of a 28-year-old kept in a segregation unit who made an emergency request for medical attention while suffering from stomach and back pain. *Lewis*, 701 F. Supp. 3d at 406. He was not given treatment, and eight hours later, he was found "collapsed on the floor, foaming at the mouth, with a temperature of 108.2 degrees." *Id.* "No attempt was made to cool the patient with ice." *Id.* The defendants excused their inaction, claiming that "by the time EMTs arrived in the patient's cell, he 'was essentially a dead man.'" *Id.* Even Louisiana did not ask us to unfind these facts.

\* \* \*

At bottom, this appeal concerns a district court order instructing parties to meet and confer. If that directive constitutes a final order bestowing jurisdiction on our en banc court to take over ongoing proceedings, then district courts have become obsolete.

---

[9] *See, e.g., infra* APPENDIX.

No. 23-30825

# APPENDIX

As noted in Footnote 1, the following text is copied from the district court's Remedial Opinion:

In the following pages, the Court will make detailed and extensive findings of the callous and wanton disregard for the medical care of inmates at Angola. The finding is that the "care" is not care at all, but abhorrent cruel and unusual punishment that violates the United States Constitution. These are but a few examples:

- After a 3-month delay in getting a CT scan that was ordered when a chest x-ray revealed a suspected malignancy, the CT confirmed the suspicious lesion, and the patient was referred to a pulmonologist. Yet the patient did not see a pulmonologist for another 4 months. After finally seeing the pulmonologist, twice the pulmonologist ordered a biopsy which the patient never received. The pulmonologist charted his frustration:

    "the biopsy didn't occur, what gives?"

    * * *

    "strongly suggest immediate IR [interventional radiology], FNA [fine needle aspiration] of left upper lobe nodule."

    Yet a biopsy was never completed. More than a year after the initial suspicious x-ray findings, the patient was hospitalized for a partial lung removal due to cancer, after which the patient was ordered to begin chemotherapy. Commencement of chemotherapy was also inexplicably delayed. The patient died.

- A 50-year-old inmate made seven requests for medical attention for escalating back pain that went unanswered. The man became incontinent and bed ridden. When medics finally evaluated him, he

was found lying on the floor. He was finally seen by a doctor but died within hours. His autopsy revealed a large liver abscess and resulting spinal cord compression.

- An inmate underwent a colectomy due to untreated Chron's disease. Angola failed to refer him to gastroenterologist, failed to provide indicated immunosuppressive therapy, and failed perform to adequate physical examinations. The patient died.

- An inmate complained of chest pain for more than 16 months. When he was finally referred to a thoracic surgeon, a biopsy of a pulmonary nodule was ordered. When finally performed, the biopsy revealed adenocarcinoma of the lung. The patient died a week later.

- An inmate complained for nearly three years of symptoms consistent with laryngeal cancer, yet he saw an Angola physician only a few times. After 33 months of constant complaints, he was diagnosed with laryngeal cancer from which he subsequently died.

- A 65-year-old man with a history of diabetes, severe coronary artery disease and heart failure presented seven times in a single month with fevers as high as 103.6 degrees, altered mental state, and complaints of chest tightness. At one point, while exhibiting an altered mental state and a fever of 103.6 degrees, he was confined to a "locked room" in the infirmary with the "hatch up," after which he was not seen by physician for three days. Two days after being discharged from the infirmary, he was found vomiting in his cell. Angola doctors ordered EMTs not to transport the sick man to the hospital. He died in his cell the next day.

- An inmate made an emergency sick call for severe flank pain. An x-ray and physical exam yielded no diagnosis. The pain progressed to the point that the man could not get out of bed, yet Angola's medical director refused EMT requests to transfer him to a hospital. Three

days later he was found unresponsive in his cell. He died the following day.

- An inmate with a tracheotomy presented with a progressively worsening cold and made repeated emergency sick calls. The inmate was seen in Angola's Acute Treatment Unit ("ATU") multiple times but each time he was simply returned to his dormitory where he finally died.

- An inmate experienced two years of abdominal pain and weight loss that was unheeded and untreated leading to hospitalization and a diagnosis of advanced stage colon cancer, resulting in a preventable death.

- An inmate suffered repeated and extensive delays in getting a colonoscopy that was ordered which resulted in emergency treatment, two hospital stays, and five surgical interventions - all avoidable.

- The failure to administer ordered Statin drugs to an inmate resulted in a heart attack and stroke requiring the inmate's repeated avoidable hospitalizations.

*Lewis v. Cain*, 701 F. Supp. 3d 361, 378–80 (M.D. La. 2023) (alterations in original) (footnotes omitted).